## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JOSEPH SNYDER,

      Plaintiff,

v.

NABORS GARAGE DOORS, LLC, et al.,

      Defendants.

CIVIL ACTION FILE NO:

1:20-cv-02101-TCB

## <u>DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

The following material facts are undisputed:

1.    Nabors Garage Doors (Nabors) services, repairs, and replaces residential garage doors. (Serena Meador dep., p. 13: 7-8).

2.    Nabors is owned by Defendant Serena Meador, who operates the business with her husband, Defendant Ronnie Meador. (Id., p. 13: 12-13; S. Meador decl., ¶¶ 4-5).

3.    Defendant Mitchell Schaker became the General Manager of Nabors on July 1, 2019, and supervised Joseph Snyder for approximately 12 days. (Schaker depo., p. 9).

4.     Joseph Snyder met Ronnie and Serena Meador in September of 2016 when they moved into a house two doors down from him in Peachtree City, Georgia. (S. Meador depo., p. 21: 24-25; 22: 1; Snyder depo., p. 8: 5-8).

5.     Snyder and the Meadors became friends. "I was over at their house all the time. Their little girl was over at my house all the time. Ronnie came over for birthday parties, stuff like that, just a normal neighbor friendship." (Snyder depo., p. 10: 13-19). Ronnie Meador agreed:

> We've had beers sitting on the back porch, sitting there talking. We've gone to play pool together. At least ten-plus times, I've loaned him money until payday whether that was at – while he was working at Nabors or while we were both at Precision or before he even went to Precision … I trained him. We'd go to – I'd buy – I bought him lunch several different times. That's pretty much it. Like, we were pretty good friends, so I thought.

(Ronnie Meador depo., p. 14: 12-24).

6.     Ronnie Meador helped Snyder get his first job in the garage door business Precision Garage Door of Atlanta. (Snyder depo., pp. 8: 1-4; 9: 2-5).

7.     Ronnie Meador worked with Snyder at Precision, initially as his trainer. (Snyder depo., p. 9: 18-20).

8.     Snyder worked at Precision for a year to a year-and-a-half, then left to take a job as a warehouse manager in the active guard reserve. (Snyder depo., pp. 24: 17-19; 25: 14-23).

9.     When warehouse manager the opportunity fell through, Ronnie Meador hired Snyder to work at Nabors as a technician. (Snyder depo., p. 7: 17-25; R. Meador depo., p. 15: 2-3).

10.    As a result of their close relationship, the Meadors were aware of Snyder's military service. (Snyder depo., pp. 71: 19-23; 72: 22-25).

11.    Snyder described how Ronnie Meador would poke fun at him about it, calling him "soldier boy," even before he ever worked for Nabors. (Snyder depo., pp. 71: 23-25; 72: 1-20).

12.    Snyder was not offended by the comments because he "knew he was joking around just trying to have a good time." (Snyder depo., p. 72: 20-21).

13.    When asked whether Ronnie Meador ever said anything negative about his military service, Snyder testified that he asked him "a couple of times" about getting out of the military. (Snyder depo., p. 83: 16-20).

14.    Other than asking Snyder when he was coming out of the military, Snyder could not recall other comments that he interpreted to be negative related to his military service. (Snyder depo., p. 85: 7-12).

15.    Snyder described how Ronnie Meador would sigh when arranging time off for Snyder's service, which Snyder interpreted to mean that Ronnie

Meador was annoyed with making the arrangements. (Snyder depo., pp. 84: 16-25; 85: 1-4; 116: 5-14; 118: 13-25; 119: 1-3).

16.    Ronnie Meador never complained about Snyder's need to take time off for military service. (Snyder depo., p. 85: 5-6).

17.    Ronnie Meador never refused to give Snyder time off for his military service obligations. (Snyder depo., pp. 119: 18-19; 187: 9-13).

18.    Serena Meador never complained to Snyder about his military service. (Snyder depo., p. 79: 16-18).

19.    Schaker never said anything about Snyder's military service to indicate a desire to discriminate against him. (Snyder depo., p. 125: 15-21).

20.    Nabors never denied Snyder's request for time off to fulfill his military service requirements. (Snyder depo., p. 127: 16-20).

21.    Nabors hired Snyder because he was a skilled garage door technician. (S. Meador decl., ¶ 8).

22.    Snyder's performance began to decline. Serena Meador observed repeated tardiness issues with Snyder beginning in January 2019. (Serena Meador depo., p. 11: 11-16).

23.    Nabors used an application called Service Titan to schedule, track, and invoice customers. (S. Meador decl., ¶ 12).

24.     When customers make an appointment for service, the office scheduled "service windows," a block of time within which a technician would arrive at a customer's home to estimate and perform requested services. (S. Meador decl., ¶ 13).

25.     For example, for the first appointment of the day Nabors informs the customer that a service technician should arrive between 8:00 AM – 10:00 AM. (S. Meador decl., ¶ 14).

26.     The service window is not for the technician; it is for the customer's convenience only. Service technicians are expected to arrive on time for the first job of the day at the beginning of the service window. (S. Meador decl., ¶ 15).

27.     After the first job of the day, the arrival time is dependent upon the time required to estimate and perform the work during each appointment. As a result, after the first appointment of the day, it is understood that technicians may arrive after the initial time stated in the service window. (S. Meador decl., ¶ 16).

28.     Arriving on time for the first appointment of the day was critical because if the technician arrives late, it impacted the company's ability to honor the service windows promised to the customers later in the day. (S. Meador decl., ¶ 17).

29.     Technicians at Nabors were required to use the Service Titan application on their phones to record their status:  when they *dispatch* to a call, when they *arrive* at a call, and when they complete a service. This information is collected in the Service Titan application. (S. Meador decl., ¶ 21).

30.     Serena Meador used the Service Titan "dispatch board" to monitor scheduled calls and technician arrival times. (S. Meador decl., ¶ 22). According to the dispatch board, Joe Snyder was significantly late to his first service call on the following dates:

- January 1, 2019: Joe arrived to his 8:00 AM job after 9:30 AM

- January 3, 2019: Joe arrived to his 8:00 AM appointment after 9:30 AM

- January 4, 2019: Joe arrived to his first 10:00 AM call after 11:00 AM

- January 7, 2019: Joe arrived to his 8:00 AM calls after 9:00 AM.

- January 14, 2019: Joe arrived to his 8:00 AM job just before 9:00 AM

- January 19, 2019: Joe arrived to his 8:00 AM call at 9:00 AM

- January 24, 2019: Joe arrived to his 8:00 AM call after 9:00 AM

- February 6, 2019: Joe was scheduled to arrive at 8:00 AM, but did not arrive until 9:00 AM

- February 11, 2019: Joe arrived to his first, 10:00 AM call around 11:00 AM

- February 13, 2019: Joe arrived to his 8:00 AM job around 9:00 AM

- February 16, 2019: Joe arrived to his 8:00 AM call close to 9:00 AM

- February 20, 2019: Joe arrived to his 8:00 AM service call at 9:30 AM

- February 22, 2019: Joe arrived to his 8:00 AM service call close to 9:00 AM

- February 23, 2019: Joe arrived to his 10:00 AM service call close to 11:30 AM

- February 27, 2019: Joe arrived to his 8:00 AM service call after 9:30 AM

- February 28, 2019: Joe arrived to his 8:00 AM service call until 9:00 AM

- March 1, 2019: Joe arrived to his 8:00 AM until after 10:00 AM (*outside the customer's promised appointment window*)

- March 5, 2019: Joe was scheduled for 8:00 AM, but arrived at 9:26 AM

- March 19, 2019: Joe was scheduled for 8:00 AM and arrived after 9:00 AM

- April 1, 2019: Joe was scheduled for 8:00 AM and arrived after 9:45 AM

- April 2, 2019: Joe was scheduled for 8:00 AM and arrived after 9:00 AM

- April 3, 2019: Joe was scheduled for 8:00 AM and arrived at nearly 10:00 AM

- April 4, 2019: Joe was scheduled for 8:00 AM and arrived at 10:00 AM

- April 15, 2019: Joe was scheduled for 8:00 AM and arrived at 8:49 AM

- April 20, 2019: Joe was scheduled for 8:00 AM and arrived after 9:00 AM

- April 26, 2019: Joe was scheduled for 8:00 AM and arrived at 8:55 AM

- April 27, 2019: Joe was scheduled for 8:00 AM and arrived after 9:00 AM

- April 29, 2019: Joe was scheduled for 8:00 AM and arrived at 8:47 AM

- May 1, 2019: Joe was scheduled for 8:00 AM and arrived after 9:00 AM

- May 7, 2019: Joe was scheduled for 8:00 AM and arrived after 9:00 AM

- May 8, 2019: Joe was scheduled for 8:00 AM and arrived after 9:00 AM

- May 9, 2019: Joe was scheduled for 8:00 AM and arrived after 10:00 AM (*outside the customer's promised appointment window*)

- May 11, 2019: Joe was scheduled for 8:00 AM and arrived after 9:30 AM

- May 24, 2019: Joe was scheduled for 8:00 AM and arrived after 9:00 AM

- May 25, 2019: Joe was scheduled for 8:00 AM and arrived after 9:30 AM

- May 29, 2019: Joe was scheduled for 8:00 AM and arrived close to 9:00 AM

- June 5, 2019: Joe was scheduled for 8:00 AM and arrived after 9:30 AM

- June 7, 2019: Joe was scheduled for 8:00 AM and arrived after 9:00 AM

- June 12, 2019: Joe was scheduled for 8:00 AM and arrived after 10:00 AM (*outside the customer's promised appointment window*)

- June 24, 2019: Joe was scheduled for 8:00 AM and arrived after 9:30 AM

- July 1, 2019: Joe was scheduled for 8:00 AM and arrived after 10:00 AM (*outside the customer's promised appointment window*)

- July 2, 2019: Joe was scheduled for 8:00 AM and arrived after 8:45 AM

- July 5, 2019: Joe was scheduled for a 10:00 AM appointment and did not arrive until 10:46 AM.

(S. Meador decl., ¶ 24, *Exhibit A* and *Exhibit B*).

31.     The dispatch board shows Snyder's appointments across the top and includes the time window for the service call. The blue line underneath the call times shows when he arrived for the call and the duration of the call. (S. Meador decl., ¶ 22).

32.     Snyder understood that it was important to show up on time for the first appointment of the day. (Snyder depo., p. 63: 14-16).

33.     He knew that customers had an expectation that the service technician will arrive on time. (Snyder depo., p. 63: 21-24).

34.     Snyder understood that when using the Service Titan system, he was required to confirm his arrival to a job site by touching the "arrive" button on the application. (Snyder depo., p. 48: 21-25).

35.     Serena Meador spoke to Snyder a few times a week asking him why he was running late for appointments. (S. Meador depo., p. 28: 9-14).

36.     When asked whether anyone ever told him to make sure he pressed the "arrive" button, Snyder admitted that "[t]hey just basically said I need to keep updating my status." (Snyder depo., p. 54: 12-20).

37.     Despite this instruction, Snyder offered an excuse: he "did [his] best, but there was times that I would forget, yes. If I was running late, trying to run –

you know, trying to – traffic was bad or something and, you know, I was trying to rush, then yeah, I would skip some stuff because I wouldn't remember." (Snyder depo., pp. 54: 12-25; 55: 1-2).

38.    When presented with specific instances of his tardiness, Snyder acknowledged that on June 7, 2019 he "might have been a little late" for his 8:00 appointment and agreed that he probably hit the "arrive" button at 9:05 AM. (Snyder depo., p. 225: 17-23).

39.    When asked why he arrived at 11:15 AM for an 8:00 appointment on June 10, 2019, Snyder responded that while he was not sure, the appointment "might" have been moved from 8:00 AM – 10:00 AM to 10:00 AM – 12:00 PM. (Snyder depo., pp. 225: 24-25; 226: 1-4).

40.    When asked about his tardiness on July 5, 2019, Snyder agreed that it was "possible" that he pushed the "arrive" button at 10:46 AM for his 10:00 AM appointment. (Snyder depo., p. 227: 5-8).

41.    While Snyder denied responsibility for his conduct, he admitted that some of the incidents were his fault because he did not "hit the dispatch or the arrive button." (Snyder depo., p. 227: 16-24).

42.     Snyder's failure to indicate his status using the "dispatch" and "arrive" buttons on the Service Titan application had nothing to do with his military service. (Snyder depo., p. 59: 20-23).

43.     Snyder missed a mandatory meeting for all technicians on May 30, 2019. When Serena Meador confronted him about it, he apologized and blamed his absence on medication he was taking. (S. Meador decl., ¶ 25; *Exhibit C*).

44.     Snyder acknowledged missing the meeting because he overslept. (Snyder depo., p. 67: 21-23).

45.     Snyder was yelled at for missing a meeting on May 30, 2019. (Snyder depo., p. 69: 3-5).

46.     According to his drill and training schedule, Snyder was scheduled for drill duty from June 1-7, 2019. (Snyder depo., pp. 91: 21-25; 92: 1-5; Deposition Exhibit 2).

47.     Snyder was excused from his June 1-7 drill duty due to his father's illness. (Snyder depo., p. 92: 22-25).

48.     Snyder's unit generated no documentation indicating that he was excused from drill duty; everything was based on verbal conversations. (Snyder depo., pp. 96: 16-25; 97: 1-5).

49.    Because he was excused from duty on July 1-7, Snyder claims that he arranged to make up his training on June 22 and 23, 2019. (Snyder depo., pp. 100: 3-7; 106:15-21).

50.    Again, he claimed that his unit generated no written documentation to verify this. (Snyder depo., p. 11: 8-13).

51.    Snyder was told that the June 22-23 make-up drill dates were cancelled "because the armory was unsatisfactory for possession" due to lead in the ceiling, but he is not "a hundred percent sure." (Snyder depo., pp. 100: 23-25; 101: 1-12).

52.    When Snyder learned that his make-up drill duty was cancelled he and his then-girlfriend decided to travel to Helen, Georgia. (Snyder depo., pp. 101: 21-25; 102: 1-10).

53.    Snyder did not notify Nabors that his make-up guard duty was cancelled. (Snyder depo., p. 192: 14-18).

54.    Nabors believed that Snyder was on guard duty on June 22-23, 2019. (Snyder depo., p. 192: 11-22).

55.    On June 27, 2019, Ronnie Meador discovered photographs of Snyder and his family in Helen, Georgia on Facebook. (Snyder depo., pp. 108: 13-25; 109: 1-3; R. Meador depo., p. 26: 10-16).

56.     Ronnie Meador and Joseph Snyder were "friends" on Facebook and could see each other's posts to the platform. (Snyder depo., p. 109: 4-6).

57.     Ronnie Meador texted pictures from Facebook, writing "This past weekend when you were supposed to be making up your weekend for guard" and "I need some explaining." (Snyder depo., pp. 110: 10-14; Deposition Exhibit 5, pp. NABORS 000073-000074; R. Meador depo., p. 25: 12-17).

58.     Snyder's trip to Helen, Georgia was a legitimate concern for Nabors because it would not be appropriate to misrepresent one's guard obligations to take a weekend off. (Snyder depo., p. 193: 5-13, 19-21).

59.     In response to legitimate concerns raised by the General Manager at the time, Davin Smith, and Ronnie Meador, Snyder promised, "I will get the letter from my readiness NCO on what happen[ed] to explain." (Snyder depo., p. 195: 3-14; Deposition Exhibit 5, p. NABORS 000073; R. Meador depo., p. 25: 20-22).

60.     Snyder never asked his National Guard NCO for a letter explaining the alleged cancelation of his make-up drill duty for June 22-23.  (Snyder depo., p. 62: 8-9).

61.     Snyder claims that he did not obtain the letter from his NCO explaining the cancelation of the June 22 & 23 make-up drill because Ronnie Meador and David Smith "never said they wanted it." (Snyder depo., p. 195: 8).

62.     Because of Snyder's performance issues, Serena and Ronnie Meador instructed their new manager, Schaker, to counsel Snyder about his performance. (S. Meador decl., ¶ 27).

63.     Schaker was not involved in making the decision; he was only required to carry it out. (S. Meador decl., ¶ 28; Schaker decl., ¶ 4).

64.     Because Schaker became the General Manager over the technicians on July 1, 2019, he did not supervise Snyder during any of the incidents related to his performance. (Schaker decl., ¶¶ 2, 4).

65.     On July 5, 2019, Schaker issued a performance warning, as follows:

Good Evening Joe-

Per our conversation you are aware that there have been some recent issues regarding your job performance.

As a result for the next 90 day period the following conditions will apply:

1.     A 1% reduction in commission
2.     Drill schedule must be provided for the remainder of 2019
3.     Any and all unexcused absences will require written documentation in the form of a doctor's note and/or a letter from your superior officer.

Joe, the above is straight from Ronnie and Serena. As I told you on the phone, you and I have a clean slate. As long as you are straight up and honest with me, I will be your strongest advocate. I believe you will turn it around as you promised. As long as you stick to that, this

Case 1:20-cv-02101-TCB   Document 44-1   Filed 05/17/21   Page 15 of 21

too shall pass. That being said, you do need to follow the above guidelines.

(Snyder depo., Deposition Exhibit 7).

66.     Schaker raised Snyder's tardiness during the call. At the time, Snyder explained, "I have the problem with hitting the dispatch and the arrive buttons." (Snyder depo., p. 59: 10-18).

67.     Snyder also acknowledged to Schaker that he was not getting to his first appointments at 8:00 AM, but offered other excuses in addition to his failure to update his status in the application, such as customers asking him to come later or that that he received the job assignments late. (Snyder depo., p. 210: 11-18).

68.     Snyder understood that the requirement in the July 5, 2019 email that he had to provide documentation for unexcused absences was based on the perception that he was untruthful about his make-up drill duties when he went to Helen, Georgia. (Snyder depo., p. 206: 19-22).

69.     Snyder did not respond to the July 5, 2019 email to dispute its accuracy. (Snyder depo., p. 209: 1-4).

70.     Snyder was late to his first appointment on July 6, 2019, arriving more than 1.5 hours after his scheduled 8:00 AM arrival time. (S. Meador decl., ¶ 30, *Exhibit A*, p. NABORS 000184; *Exhibit B*, p. NABORS 000070.)

71.    Snyder was late twice more, on July 11 and July 12, 2019 when he arrived 1.5 hours after his scheduled 8:00 AM appointments on each day. (Id., ¶ 31, *Exhibit A*, pp.  000185-186; *Exhibit B*, p. 000071).

72.    Snyder had annual guard training scheduled from July 13 – 28, 2019. (Snyder depo., pp. 110: 23-25; 111: 1).

73.    While preparing to leave for his annual training, Snyder removed all the tools from his assigned truck before turning it in to Nabors. (Snyder depo., pp. 22: 25; 23: 1-4).

74.    Snyder knew that Ronnie Meador was going to use the truck while he was on his annual training duty: "He said that he was going to use it, that he needed the truck to run calls." (Snyder depo., p. 22: 17-21).

75.    Because all the tools were removed, Ronnie Meador was unable to run service calls. (S. Meador depo., p. 41: 9-11).

76.    Serena Meador had to then call all the customers to let them know service was running behind while Ronnie Meador went to Home Depot to purchase new tools. (S. Meador depo., pp. 41: 13-16, 22-23; 43: 12-16).

77.    On July 13, Ronnie Meador texted Snyder to complain: "So you took all tools and ladder off the truck are you telling me something?" followed by: "This again is complete bull shit one that impact is my impact to begin with. Told

you we need truck to run calls the only person we have is me to run calls in this truck." (Snyder depo., Deposition Exhibit 5, p. NABORS 000130).

78.    Ronnie Meador also texted, "Just cost me $600 plus thanks."  (Snyder depo., Deposition Exhibit 5, p. NABORS 000130).

79.    Ronnie and Serena Meador decided to terminate Snyder. (S. Meador depo., p. 32: 24-25; R. Meador depo., pp. 16: 19-22; 19: 20-22).

80.    Schaker did not make the decision. He carried out the decision based on direction from Ronnie and Serena. (Schaker decl., ¶¶ 13, 17).

81.    Schaker was instructed to terminate Snyder when he returned from guard duty. (Schaker decl., ¶ 14).

82.    Snyder was dismissed from his guard training on July 27, 2019 and drove home. (Snyder depo., pp. 111: 9-25; 112: 1-9).

83.    On July 27, Snyder texted Ronnie Meador about coming in to pick up his truck on Sunday, July 28. (Snyder depo., pp. 15: 3-10; 113: 16-19).

84.    Because Ronnie Meador did not respond, Snyder called Mitch Schaker. During this conversation, Schaker informed Snyder that he was terminated. (Snyder depo., p. 113: 13-22).

85.    Schaker told Snyder "Ronnie [Meador] was upset that I took the tools off my truck when I turned my truck in for my AT [Guard Annual Training] and I was no longer employed by Nabors Garage Doors." (Snyder depo., p. 14: 2-8).

86.    Snyder recalls that Schaker mentioned "the fact that I turned the truck in with no tools, no ladders on the truck." (Snyder depo., pp. 20: 24-25; 21: 1-7).

87.    When Schaker told Snyder that one of the reasons for his termination was his removal of the tools from the truck, Snyder responded, "look, I know he had to spend money on tools, I'll pay him back for the tools, just give me my job back." (Snyder depo., p. 14: 22-25).

88.    Schaker also mentioned that Ronnie Meador continued to believe that Snyder lied about his military service when he went to Helen, Georgia instead of his make-up drill duty. (Snyder depo., pp. 16: 16-25; 17: 1-11; 18: 8-15; Schaker decl., ¶ 18).

89.    Snyder requested a written termination notice, which Schaker provided in an email on July 28, 2019, as follows:

Dear Mr. Snyder

On July 27, 2019, your employment with Nabors Garage Doors LLC will be officially terminated for the following reasons:

You were made aware via email on July 5, 2019, and acknowledged verbally, that there have been recent issues regarding your job performance including but not limited to, failing to report to

mandatory meetings and consistently arriving late to first scheduled
job during normal business hours. After these initial warnings you
turned your truck over to the owner, Ronnie Meador, for a two-week
time period so that he could fill in while you were away on guard
duty. You failed to let him, or the manager, Mitch Schaker, know that
you had removed all tools etc. from the company work truck therefore
hindering the ability of the owner to complete jobs.

I wish you the best in fining new employment.

Sincerely,

Mitchell Schaker
Manager, Nabors Garage Doors LLC

(Snyder depo., Deposition Exhibit 8).

90.    When Schaker addressed Snyder's arrival times for jobs on July 5,

2019, Snyder responded, "How can I be running late if I have a two-hour window

to arrive somewhere?" (Snyder depo., p. 210: 8-10).

91.    Ronnie Meador never denied him time off for military duty. (Snyder

depo., p. 119: 18-19).

92.    When Ronnie Meador asked about the length of some of Snyder's

obligations it was not intended in a negative way, but rather as legitimate questions

from an employer. (Snyder depo., pp. 120: 2-25; 121: 1-7).

93.    Schaker did not participate in the decisions to discipline or terminate

Snyder. He was instructed to carry out decisions made by Ronnie and Serena

Meador. Snyder has "no doubt" that Serena and Ronnie Meador wanted to fire him and that Mitch Schaker just said, "okay." (Snyder depo., p. 208: 7-13).

94.     Schaker does not have an ownership interest in the Atlanta business, and only became the supervisor over technicians on July 1, 2019, 11 days before Snyder left for his annual military training. At the time Snyder was terminated, Schaker did not hire or fire employees. (Schaker decl., ¶ 18).

95.     Schaker did not have authority over Snyder's schedule. He had to obtain approval from Ronnie Meador before allowing Snyder to take time off to make up his drill duties. (Snyder depo., p. 98: 15-18).

Respectfully submitted this the 17th day of May 2021.

A. Lee Parks, Jr.
Georgia Bar No. 563750
lparks@pcwlawfirm.com
Andrew Y. Coffman
Georgia Bar No. 173115
acoffman@pcwlawfirm.com

**PARKS, CHESIN, & WALBERT, P.C.**
75 14th Street, NE, 26th Floor
Atlanta, GA 30309
Telephone: 404-873-8000
Facsimile:  404-873-8050
*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE AND**</u>
<u>**COMPLIANCE WITH LOCAL RULE 5.1(C)**</u>

I certify on May 17, 2021, that I filed **DEFENDANTS' STATEMENT OF**

**UNDISPUTED MATERIAL FACTS** with the Clerk of Court using the CM/ECF

system, which will automatically send email notification of such filing to all

attorneys of record.

I also certify that the foregoing has been prepared in a Times New Roman

14 point font, one of the font and point selections approved by the Court in Local

Rule 5.1(C).

_____
Andrew Y. Coffman
Georgia Bar No. 173115
acoffman@pcwlawfirm.com

-21-