IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOSEPH SNYDER,

      Plaintiff,

v.

NABORS GARAGE DOORS, LLC;
SERENA MEADOR; RONNIE
MEADOR; and MITCHELL
SCHAKER,

      Defendants.

CIVIL ACTION FILE

NO. 1:20-cv-2101-TCB

# **O R D E R**

This USERRA[1] case comes before the Court on the parties' cross-

motions [43, 44] for summary judgment.

## I.   **Background**

In June or July of 2018, Defendants Serena and Ronnie Meador

hired their friend and neighbor, Plaintiff Joseph Snyder, as a garage

---

[1] The Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301, et seq.

door technician for their company, Defendant Nabors Garage Doors, LLC. Nabors services, repairs, and replaces garage doors. The Meadors had been friends with Snyder, a member of the Georgia Army National Guard, since 2016, and Ronnie had previously worked with Snyder at another garage door business.

Nabors uses an application to schedule, track, and invoice customers for services. When a customer makes an appointment, Nabors schedules a two-hour "service window," a block of time within which a technician arrives at a customer's home to estimate and perform requested services. According to Serena, service technicians are expected to arrive at the beginning of the two-hour service window for the first job of the day. Doing so is critical because if the technician arrives late, it affects the company's ability to honor the service windows promised to customers later in the day.

Beginning in January 2019, Serena noticed what she considered to be repeated tardiness issues with Snyder. When reviewing the service application's dispatch board, she discovered that between January 1 and July 2, 2019, Snyder arrived after the beginning of the service

window for the first appointment of the day on forty-two occasions. On

twenty-eight of those occasions, he did not arrive until the second hour

of the service window. He insists that technicians were permitted to

arrive at any time during the two-hour window for the first job of the

day; even so, the dispatch application shows that he arrived *after* the

close of the promised service window on four occasions.[2] He also missed

a mandatory meeting for all technicians on May 30, 2019 after

oversleeping.

Serena testifies that she texted Snyder a few times a week to ask

why he was running late for appointments. Snyder disputes that Serena

spoke to him about running late but admits that his manager informed

him that he needed to be sure to keep his status updated and that he

was yelled at for missing the May 30 meeting.

---

[2] In a declaration attached to his reply brief, Snyder speculates that the dispatch board times "were able to be altered." [52] at 6. However, his opinions are not supported by citations to evidence, and this speculation is insufficient to create a genuine issue of disputed fact. Further, he insists in his declaration that he "was not late," *id.* at 5, but simultaneously provides explanations and justifications for his repeated tardiness. These explanations are also unsupported by citations to the record, and several directly contradict statements he made under oath in his deposition. *See* [53] at 11–12. Regardless, the undisputed facts show that Defendants relied on objective data to conclude that Snyder was arriving late to service calls.

Around that same time, an issue arose with Snyder's National Guard drill schedule. Snyder was initially scheduled for drill duty from June 1–7, 2019, but he was verbally excused due to his father's illness. He arranged to make up his training on June 22 and 23 and approved his schedule change with Defendant Mitchell Schaker, Nabors's incoming general manager. However, when Snyder arrived for his makeup drill duty, the armory was locked. He called his superior officer and learned that the makeup dates were cancelled. As such, he arranged to travel to Helen, Georgia with his family. He did not notify Nabors that his makeup training was cancelled.

On June 27, 2019, Ronnie Meador saw photographs of Snyder's trip to Helen on Facebook. Concerned that Snyder had misrepresented his guard obligations, Ronnie texted Snyder and asked him to explain. Nabors's then-general manager, Davin Smith, also raised concerns to Snyder. In response, Snyder offered to get a letter from his superior officer explaining the situation, but he never asked for the letter.

Around July 1, Schaker was named Nabors's general manager. As a result of Snyder's tardiness and unexcused absences, the Meadors

4

instructed Schaker to discuss Snyder's performance deficiencies with him and discipline him accordingly.

On July 5, Schaker had a conversation with Snyder about his unexcused absences and the fact that he was continually late for the first job of the day. Snyder explained that he did not always arrive at the beginning of the service window for various reasons, including travel time, and that sometimes customers instructed him by phone to arrive later.

That day, Schaker emailed Snyder a performance warning, which stated in pertinent part,

> Per our conversation you are aware that there have been some recent issues regarding your job performance.
>
> As a result for the next 90 day period the following conditions will apply:
>
> 1.    A 1% reduction in commission
> 2.    Drill schedule must be provided for the remainder of 2019
> 3.    Any and all unexcused absences will require written documentation in the form of a doctors [sic] note and/or a letter from your superior officer.

[45-6] at 203.

Despite his conversation with Schaker, Snyder arrived about an hour and a half after the beginning of the service window for his 8:00 a.m. appointments on July 6, 11, and 12.

Snyder's annual guard training was scheduled for July 13–28, 2019, and he was told that Nabors needed his assigned truck for calls while he was away at training. Before leaving for annual duty, he removed his personal tools from his truck.[3] On July 13, Ronnie and Schaker texted Snyder, upset that he had removed his tools without notifying anyone (because whoever was going to use the truck was going to need tools). Snyder responded that Ronnie could retrieve Snyder's tools from his (Snyder's) home, but Ronnie had already purchased new tools that morning—and ran behind schedule as a result.

While Snyder was away at his July 13–28 annual training, Serena recommended to Ronnie and Schaker that he be terminated. Serena, Ronnie, and Schaker subsequently agreed to terminate Snyder when he returned from guard duty.

_____

[3] Snyder used his own tools for work, and on a prior occasion when someone at Nabors used his assigned truck while he had the day off, the truck was returned with several tools missing.

6

On July 27, after returning home from guard duty, Snyder called Schaker about picking up his truck the following day. In response, Schaker told him that his employment with Nabors was terminated. Snyder testifies that Schaker gave him two reasons for his termination: he turned in his assigned truck without tools before leaving for training, and Ronnie believed he lied about his military duty schedule. Snyder begged to keep his job to no avail.

Snyder asked Schaker for a written termination notice. The letter, emailed to Snyder on July 28, states that his employment was terminated on July 27 for the following reasons: (1) he had been warned about recent issues with his job performance "including but not limited to, failing to report to mandatory meetings and consistently arriving late to first scheduled job during normal business hours"; and (2) after these warnings, he turned his company truck over to Ronnie without letting anyone know that he had removed his tools from the truck, thereby hindering Ronnie's ability to complete jobs. [45-3] at 56.

On May 15, 2020, Snyder filed this action. In his amended complaint, he alleges that Defendants willfully violated USERRA by

7

failing to reemploy him (count one) and discriminating against him (count two). He also alleges that Defendants' violations of USERRA also constitute violations of O.C.G.A. § 38-2-280, the Georgia statute that incorporates the USERRA (count three).

Before the Court are Snyder's motion [43] for partial summary judgment on the issue of liability and Defendants' cross-motion [44] for summary judgment.

## II.  Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In making this determination, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must "view

all of the evidence in the light most favorable to the nonmoving party

and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the

absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986)). If the nonmoving party would have

the burden of proof at trial, there are two ways for the moving party to

satisfy this initial burden. *United States v. Four Parcels of Real Prop.*,

941 F.2d 1428, 1437–38 (11th Cir. 1991). The first is to produce

"affirmative evidence demonstrating that the nonmoving party will be

unable to prove its case at trial." *Id.* at 1438 (citing *Celotex Corp.*, 477

U.S. at 331). The second is to show that "there is an absence of evidence

to support the nonmoving party's case." *Id.* (quoting *Celotex Corp.*, 477

U.S. at 324).

If the moving party satisfies its burden by either method, the

burden shifts to the nonmoving party to show that a genuine issue

remains for trial. *Id.* At this point, the nonmoving party must "'go

beyond the pleadings,' and by its own affidavits, or by 'depositions,

answers to interrogatories, and admissions on file,' designate specific

9

facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting *Celotex Corp.*, 477 U.S. at 324).

## III.  Discussion

At bottom, Snyder alleges that Defendants devised a scheme to get rid of him because they had grown annoyed with his military obligations. He brings two claims under USERRA, which was enacted "to prohibit employment discrimination on the basis of military service as well as to provide prompt reemployment to those individuals who engage in non-career service in the military." *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1234 (11th Cir. 2005) (citing 38 U.S.C. § 4301).

### A.  Failure to Reemploy Claim

Snyder first alleges that Defendants denied him reemployment after his period of active service in violation of USERRA.

Section 4312 of USERRA provides reemployment rights to "any person whose absence from a position of employment is necessitated by reason of service in the uniformed services." 38 U.S.C. § 4312(a). To

invoke the right to reemployment, a returning service member must comply with the statute's procedural requirements, including providing advance notice of service and promptly reporting for reemployment upon return. *Id.*

In determining an employer's obligation to reemploy a returning service member, "courts construe broadly USERRA's protections in favor of the returning service member." *United States v. Ala. Dep't of Mental Health & Mental Retardation*, No. 2:08-cv-1025-MEF, 2010 WL 454905, at *6 (M.D. Ala. Feb. 10, 2010) (citing *Petty Metro. Gov't of Nashville-Davidson Cnty.*, 538 F.3d 431, 439 (6th Cir. 2008)). To prove a violation of § 4312, an employee is not required to show any discriminatory animus on the part of the employer. *Coffman*, 411 F.3d at 1235.

Snyder claims that he provided advance notice of his impending service and after his service he timely contacted Defendants about his intent to return to work. Nevertheless, Defendants refused to reemploy him. Defendants respond that Snyder's reemployment claim glosses

11

over his termination and Defendants' reason for it—his subpar

performance.

USERRA provides an affirmative defense to a reemployment

claim where "the employer's circumstances have so changed as to make

such reemployment impossible or unreasonable." 38 U.S.C.

§ 4312(d)(1)(A). This section ensures that § 4312(a) "cannot act as an

absolute guarantee of reemployment, counterbalancing the protection of

military service-men and women with the reality of changing business

needs and employee/employer relationships that would make

reemployment unreasonable." *United States v. Nevada*, 817 F. Supp. 2d

1230, 1242 (D. Nev. 2011) (quoting *Hays v. Commc'n Techs., Inc.*, 753 F.

Supp. 2d 891, 899 (S.D. Iowa 2010)); *see also id.* at 1243 (explaining

that the exception is "intended to address those situations where the

change in circumstances would have led to the employee's termination

even if he had never left for military leave"). The employer bears the

burden of proving the impossibility or unreasonableness of

reemployment. 38 U.S.C. § 4312(d)(2).

Defendants argue that Snyder should be denied summary judgment and that they are entitled to summary judgment because they terminated Snyder based on performance issues, making any continued employment or reemployment unreasonable. The Court agrees.

Put simply, Defendants did not refuse to reemploy Snyder in the manner proscribed by the statute. Instead, they fired him due to performance deficiencies and misconduct prior to him taking leave. And under the plain meaning of the statute, "it would be unreasonable to require reemployment of an employee who had been fired for cause based on actions taken before reemployment." *Hays*, 753 F. Supp. 2d at 899 (also noting that USERRA does not give a person on military leave carte blanche to violate a company's trust while on leave or engage in insubordinate behavior that would be cause for dismissal at any other time); *see also Milhauser v. Minco Prods., Inc.*, 855 F. Supp. 2d 885, 900 (D. Minn. 2012) ("USERRA allows an employer to refuse to rehire an employee who had been fired for cause based on actions taken before reemployment." (citation omitted)).

Based on the undisputed evidence viewed in the light most favorable to Snyder, Defendants have carried their burden of showing the unreasonableness of reemploying Snyder after firing him for cause. Accordingly, Snyder's motion for summary judgment on his reemployment claim will be denied, and Defendants' cross-motion for summary judgment will be granted.[4]

## B.   Discrimination Claim

Next, Snyder alleges that Defendants discriminated against him in violation of USERRA by terminating him based on his military service. Defendants contend that they are entitled to summary judgment because Snyder cannot show that his military status was a motivating factor in his termination.

USERRA ensures that a person who has an obligation to perform uniformed service "shall not be denied initial employment,

---

[4] Snyder argues that Defendants should not be granted summary judgment on the reemployment claim because they failed to brief the claim in their motion for summary judgment. Defendants respond that their reasons for terminating Snyder—the adverse employment action that is the basis for Snyder's discrimination claim—are the same reasons supporting their decision not to reemploy him, and thus that the issues of termination and reemployment are "two sides of the same coin." [53] at 4. The Court agrees. Moreover, Defendants move for summary judgment on Plaintiff's "claims." [44] at 25.

14

reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that" service obligation. 38 U.S.C. § 4311(a).

Courts apply a burden-shifting framework to USERRA claims brought under § 4311. To establish a prima facie case of discrimination under USERRA, Snyder must show by a preponderance of the evidence that his military status was a motivating factor in the decision to terminate him. *Id.* § 4311(c); *Coffman*, 411 F.3d at 1238 (citing *Brandsasse v. City of Suffolk*, 72 F. Supp. 2d 608, 617 (E.D. Va. 1999)). If Snyder makes this showing, the burden shifts to Defendants to prove the affirmative defense that the same actions would have been taken despite Snyder's military status. 38 U.S.C. § 4311(c); *Coffman*, 411 F.3d at 1238–39 (quoting *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001)).

### 1.  Snyder's Prima Facie Case

To be a motivating factor, Snyder's military status does not have to have been the sole cause of his termination. *Coffman*, 411 F.3d at 1238. "[M]ilitary status is a motivating factor if the defendant relied on,

15

took into account, considered, or conditioned its decision on that consideration." *Id.* (quoting *Brandsasse*, 72 F. Supp. 2d at 617). Unlike § 4312, § 4311 "clearly mandates proof of discriminatory motive." *Id.* (citing *Sheehan*, 240 F.3d at 1013; *Brandsasse*, 72 F. Supp. 2d at 616–17).

Discriminatory motive or intent may be proven by either direct or circumstantial evidence. *Sheehan*, 240 F.3d at 1014 (citations omitted). "Circumstantial evidence plays a critical part in these cases, 'for discrimination is seldom open or notorious.'" *Coffman*, 411 F.3d at 1238 (quoting *Sheehan*, 240 F.3d at 1014). Courts can infer discriminatory motivation under USERRA from a variety of considerations, such as:

> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Id.* (quoting *Sheehan*, 240 F.3d at 1014).

The Court finds that Snyder has failed to present direct or circumstantial evidence sufficient to create a genuine issue of disputed

16

fact as to whether his military service was a motivating factor in his

termination.

The Court will first examine Snyder's proffered direct evidence. As

evidence that Defendants took into account his military status when

deciding to terminate him, Snyder argues,

> [E]ach [Defendant] has stated that Plaintiff left work to
> perform his military service and upon leaving, removed tools
> from the work truck. Defendants contacted Plaintiff and
> inquired about the status of Plaintiff's tools and when he did
> not respond quickly enough, made purchases for their own
> set of tools. Defendants have admitted knowing that the
> delay in response time was caused by his service.

[43-1] at 11. But all this shows is that Defendants were aware of

Snyder's military service; mere knowledge is not sufficient to show that

Defendants "relied on, took into account, considered, or conditioned

[their adverse employment] decision on that consideration." *Coffman*,

411 F.3d at 1238.

As further direct evidence of discriminatory intent, Snyder claims

that "Schaker admitted that the [July 5] discipline was due to Plaintiff's

military service." [43-1] at 12. But Snyder mischaracterizes Schaker's

testimony. Instead, when asked whether the discipline was "based on

17

[Snyder's] military service," Schaker testifies, "My understanding—it's based on him being less than honest about his military service." [46-5] at 17:16-19. This distinction is critical. Schaker's undisputed testimony is that the July 5 discipline was based in part on perceived issues related to tardiness, unexcused absences, and dishonesty.[5]

Finally, Snyder argues that Defendants' refusal to reemploy him in violation of USERRA can be construed as direct evidence of discriminatory intent. But in support of this proposition, Snyder cites only the appropriate standard for an employer to prevail on a USERRA affirmative defense. *See, e.g.*, *Brown v. Houser*, 129 F. Supp. 3d 1357, 1377 (N.D. Ga. 2015). Further, the Court has found that Defendants did not violate USERRA by failing to reemploy Snyder.

Turning to Snyder's circumstantial evidence of discrimination, he contends that the Court may infer discriminatory intent from (1) the

---

[5] Moreover, in his motion Snyder seems to argue that Defendants discriminated against him when they disciplined him *and* when they terminated him. However, his amended complaint alleges discrimination only with respect to his termination. Snyder will not be permitted to amend his discrimination claim in his motion for summary judgment; the Court will consider the claim in light of the allegations in the operative pleading. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

temporal proximity between his service and his termination; (2) alleged inconsistencies between Defendants' proffered reasons for his termination; (3) Defendants' anti-military animus as demonstrated by derogatory remarks; and (4) disparate treatment of other, non-military employees. The Court will consider each in turn.

First, Snyder argues that because Defendants fired him the day he returned from annual training, the Court can infer that his military service was the motivation for his termination. Defendants respond that Snyder was fired immediately following his decisions to continue to arrive late for the first appointments of the day—even after receiving a warning—and to remove his tools from the truck despite knowing it would be used in his absence. It was not because of his service that he was terminated but rather his undisputed actions prior to leaving for training. The Court agrees.

The evidence viewed in the light most favorable to Snyder does not show any causal connection between the timing of his military training and his termination. Thus, discriminatory motivation cannot

be inferred from the proximity in time between Snyder's military activity and his termination.

Second, Snyder argues that Defendants provided inconsistent reasons for his termination, which evidences discriminatory motivation. But Defendants were clear with Snyder at the time of his termination that he was being fired for his tardiness and absences *and* for hindering Ronnie's ability to make service calls by removing his tools from the truck. Defendants' reasons for terminating Snyder have been consistent and are well-documented. Thus, this argument also fails.

Third, Snyder contends that Defendants used denigrating terms to refer to his military service and harassed him about his service. He points to evidence that—before he began working at Nabors—Ronnie would call him various names such as "soldier boy" and "GI Joe." [43-4] at 72:2, 5-6.[6] He further testifies that when he would talk with the Meadors about his service, Serena would walk out of the room, and that Ronnie would continually ask when he was getting out of the military.

---

[6] Snyder also states that "Defendants . . . refer[red] to him as 'tampon'" because of his monthly obligations, but he testifies that it was Ronnie's brother James Meador who called him that name, who is not a Defendant in this case.

This evidence is not the kind of "expressed hostility" that would be probative of discriminatory intent. *Coffman*, 411 F.3d at 1238; *see Wooldridge v. City of Melbourne*, 212 F. Supp. 3d 1205, 1210 (M.D. Fla. 2015) (finding that the plaintiff established a prima facie case of discrimination where his supervisors made derogatory comments when he scheduled leave, his peers derided him for years with negative references to his reserve status, and supervisors and coworkers caricatured reservists as "evil"). And other than Ronnie's questions about when Snyder would be leaving the military, Snyder could not recall any negative comments related to his military obligations.

Finally, Snyder argues that non-military employees were allowed to remove personal tools from the company trucks. He testifies that James Meador, Ronnie's brother, would remove his tools from his truck any time that he turned his truck in.

But again, the record shows that Snyder was not fired for removing his tools but for hindering Ronnie's ability to make service calls (in addition to performance issues). Snyder has not offered any evidence that James's conduct disrupted business. Thus, he has not

21

shown that the Court may infer discrimination from disparate treatment of any employees with similar work records.

In sum, Snyder has not shown a genuine issue of material fact sufficient to withstand summary judgment as to whether his military status was a motivating factor in his termination.

### 2.    Defendants' Affirmative Defense

Even if Defendants had conditioned their decision in part on Snyder's military status, summary judgment in their favor would be proper because the undisputed facts show that they would have made the same decision regardless of Snyder's military status.

After the employee makes a prima facie showing of discrimination, "the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Brown*, 129 F. Supp. 3d at 1375 (quoting *Coffman*, 411 F.3d at 1238–39). In other words, summary judgment for Defendants is appropriate if they can produce undisputed evidence that they would have terminated Snyder even in the absence of any improper motive. *Id.* at 1376 (quoting *Murphy v. Radnor Twp.*, 542 F.

App'x 173, 177 (3d Cir. 2013)). To be entitled to summary judgment, Defendants' evidence must be "so compelling and so meagerly contested . . . that a trial would be a waste of time." *Id.* at 1376 (quoting *Madden v. Rolls Royce Corp.*, 563 F.3d 636, 638 (7th Cir. 2009)).

As Snyder admits, the Meadors were aware of his military service obligations when they hired him as a technician. They did not prevent him from attending a single guard drill or training, and though Snyder felt that Ronnie was exasperated by having to accommodate his training schedule, he admits that he did not perceive anything negative about Ronnie's questions regarding his schedule.

Rather, Defendants had legitimate, non-discriminatory reasons for Snyder's termination. The evidence shows that Snyder arrived well after the beginning of the service window for the first call of the day on numerous occasions and outside of the service window for his first call on at least four occasions. He missed a mandatory meeting, and he continued his pattern of tardiness even after being disciplined. Moreover, Snyder hindered Ronnie's ability to make service calls by not

telling anyone that he removed his personal tools from his company truck before leaving for training.

Because Defendants have offered sufficient, undisputed evidence that they would have terminated (and refused to re-hire) Snyder even in the absence of his military service, they are entitled to summary judgment.[7]

### C.   O.C.G.A. § 38-2-280 Claim

Snyder contends that O.C.G.A. § 38-2-280 incorporates the protections of USERRA, and as such, Defendants' violations of USERRA constitute violations of § 38-2-280. Because Defendants are entitled to summary judgment on Snyder's USERRA claims, they are also entitled to summary judgment on Snyder's state law claim.

It is clear Snyder believes that his termination was unfair. However, he has not shown a genuine dispute of material fact as to whether his termination (and Defendants' refusal to reemploy him) was

---

[7] Even if Snyder's USERRA claims could survive summary judgment, he would not be entitled to summary judgment on the issue of willfulness. The record is devoid of any evidence that Defendants "either knew or showed reckless disregard for whether [their] conduct was prohibited" by USERRA. 20 C.F.R. § 1002.312(c) (2006).

discriminatory or otherwise in violation of USERRA. Indeed, after setting aside Snyder's unsupported personal opinions and legal conclusions, there is an absence of competent evidence to support his claims. Accordingly, summary judgment in favor of Defendants is warranted.

## IV.   Conclusion

For the foregoing reasons, Snyder's motion [43] for partial summary judgment is denied. Defendants' motion [44] for summary judgment is granted, and judgment is hereby entered in favor of Defendants.

The Clerk is directed to close this case.

IT IS SO ORDERED this 15th day of March, 2022.

Timothy C. Batten, Sr.
Chief United States District Judge